# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**KEITH R. MELANSON,**

       **Plaintiff,**

**v.**                                                   **ACTION NO. 2:18cv488**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

       **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Keith R. Melanson ("Melanson") seeks judicial review of the Acting Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under the Social Security Act.    Melanson claims that the Administrative Law Judge ("ALJ") improperly analyzed a listed impairment, failed to give appropriate weight to the findings of a treating physician, and erred in evaluating his subjective complaints.  This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure.  This report concludes that the ALJ did not err in evaluating the medical evidence or Melanson's testimony, and thus recommends that the final decision of the Commissioner be affirmed.

## I.    PROCEDURAL BACKGROUND

Melanson filed an application for DIB on May 13, 2015, alleging a disability onset date of June 15, 2014. (R. at 162, 164).  The Commissioner denied his application initially, (R. at 94), and

upon reconsideration, (R. at 100). Melanson requested an administrative hearing and received one on September 28, 2017. (R. at 27).

The ALJ determined that Melanson was not disabled within the meaning of the Social Security Act and denied his claim for benefits. (R. at 9). The Appeals Council declined to review the ALJ's decision, (R. at 1), making the ALJ's decision the final decision of the Commissioner. Melanson filed this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). This case is now before the court in order to resolve the parties' cross-motions for summary judgment.

## II.   **FACTUAL BACKGROUND**

Melanson was nearing 43 years old at his alleged onset date in 2014, and 46 at the time of the hearing. (R. at 72). He completed college and had over ten years work experience as an operations manager and call center supervisor in the telecommunications field. (R. at 218, 36-37). He stopped working in 2014, testifying that he was terminated for excessive absenteeism. (R. at 36-37). His application also noted that the business he worked for closed at the same time. (R. at 202).

He has been treated since 1998 for several overlapping conditions by rheumatologist Albert Lee, M.D. (R. at 524, 375-499). Dr. Lee's detailed treatment notes in the record extend back to 2011, three years before Melanson stopped working, but selected documents establish that he had been diagnosed with mixed connective tissue disorder and other autoimmune disorders long before then. (R. at 552) (1998 letter confirming Melanson's diagnoses of connective tissue disease and Raynaud's Syndrome); R. at 519 (documenting temporary absence in 2006)).

Relevant to the period under review, Melanson consulted Dr. Lee in April 2014. His connective tissue disease lab results were normal and on physical exam he had no acute synovitis

and a good range of motion in his shoulders and knees. (R. at 290-91). He requested a refill of hydrocodone. (R. at 290). On September 29, 2014, Melanson returned to Dr. Lee reporting increased pain and fatigue and again requesting a medication refill. (R. at 288). His physical examination and lab results were normal. Dr. Lee administered a steroid injection and renewed prescriptions. (R. at 288-89). Dr. Lee also provided a work excuse on this appointment for the days preceding the visit but stated that Melanson could return to work the following day, September 30, 2014. (R. at 450).

After his September visit, Melanson did not return to see Dr. Lee until March of 2015, a period of time which encompassed his alleged onset date and cessation of work in November 2014. At his next appointment on March 5, 2015, he complained of "more pain 'all over'" and increased fatigue. (R. at 286). His physical exam remained unchanged with a good range of motion in shoulders and knees. He was again given a steroid injection and a prescription for Tramadol. (R. at 285-87). On June 26, 2015, Dr. Lee was away and Melanson was seen by his colleague, Dr. John Dye. (R. at 283-84). Dr. Dye's notes indicate that Melanson was "fairly vague about his symptoms." (R. at 284). His physical exam detected no fibromyalgia tender points, no acute synovitis, and good range of motion in his shoulders and knees. (R. at 284). Dr. Dye declined to refill Melanson's hydrocodone prescription but did refill his tramadol. (R. at 283). On August 11, 2015, Melanson returned to Dr. Lee and received another steroid injection. He reported feeling poorly with more arthralgias and fatigue, but his physical examination remained unchanged with no acute synovitis and a good range of motion. (R. at 282). He was fully oriented with an intact memory. (R. at 282). Melanson returned on August 28, 2015, reporting that the steroid injection did not help and that his muscle pain was worsening. Dr. Lee believed he was "having a flare of

fibromyalgia." (R. at 311-12). Again, his laboratory testing and physical examination were normal. Dr. Lee prescribed a new medication, Elavil. (R. at 312-13).

On October 8 and December 8, 2015, Dr. Lee's notes reflect Melanson's connective tissue disorder "seems stable" but also that the "fibromyalgia continues to flare." (R. at 324-25). Dr. Lee indicated Melanson did not tolerate the Elavil well as it made him too sleepy. (R. at 325). His October 8 examination was "normal except for classic fibromyalgia tender points present in all four quadrants." (R. at 325). Melanson did not return to Dr. Lee until March 2016. On that visit he requested a refill of tramadol and said he was experiencing severe fatigue and myalgias. Dr. Lee again noted his CTD as stable. (R. at 397). He appeared well, and his physical exam, including range of motion, was normal. (R. at 398).

In August 2016, Dr. Lee again observed Melanson had fibromyalgia tender points in all four quadrants. (R. at 398). At Melanson's request he ordered x-rays of his neck and back, the results of which were mostly unremarkable. The thoracic spine x-rays were entirely normal, and the x-rays of Melanson's cervical spine showed minimal uncinate hypertrophy at C3 - C4 and mild to moderate disc space narrowing at C5 - C6. (R. at 385).

Melanson returned to Dr. Lee on December 30, 2016 when notes indicate he had "some response" to the steroid injections. (R. at 390). Dr. Lee observed that medication options might be limited as a result of Melanson having no insurance. (R. at 390, 394-95). He continued Melanson on Humira, but discontinued Cymbalta as a result of the cost. Melanson returned for additional steroid injections in February and May 2017. On May 23, Dr. Lee noted that Melanson continued to complain of "pain everywhere." (R. at 375). His notes reflect that Melanson had "both MCTD [mixed connective tissue disease] and fibromyalgia" and that the fibromyalgia "might be flaring some." (R. at 375). Dr. Lee refilled his tramadol and administered another

4

steroid injection, directing follow up in three months. (R. at 375). This is the last treatment note of record before Melanson's September 2017 hearing before the ALJ.

In addition to his medical treatment notes, Dr. Lee provided three evaluations to assist Melanson in obtaining various government benefits. In March and May 2016, Dr. Lee completed evaluations to assist in obtaining food stamps. He indicated that Melanson was unable to work in any capacity for an unknown duration. (R. at 441-43). He listed his diagnosis as undifferentiated CTD (primary) and fibromyalgia (secondary). (R. at 441-44). The March form indicates that Dr. Lee had recommended his patient apply for disability benefits. (R. at 443). However, on the May 2016 form he checked that he had not advised him to reduce work hours, take a leave of absence, or quit his job due to health-related reasons. On this form Dr. Lee checked that he had not advised Melanson to apply for disability.[1] (R. at 442).

In addition to these two evaluations for food stamps, on August 3, 2017, Dr. Lee completed and signed a 15-page statement which had been prepared by Melanson's attorney in connection with his application for disability benefits. (R. at 31-32, 529-43). The form has detailed narrative statements drawn from websites and medical journals and selectively from Lee's treatment notes. Most statements are preceded by a box which the doctor was instructed to check indicating his agreement. On the form, Dr. Lee checked every box where his assent was requested and made no changes or corrections to the text prepared by Melanson's attorney. Specifically, he checked boxes indicating that Melanson would be unable to work full time in competitive employment, would miss more than four days of work per month, and that his symptoms would interfere with attention

---

[1] The May form is actually dated May 13, 2015, but it is based on an exam which took place May 6, 2016. (R. at 441). It appears Melanson concedes the form was prepared in May 2016 – after his March 2016 SNAP evaluation – and the 2015 date on the form is an error. Mem. Supp. Mot. for Summ. J. ¶ 41 (ECF No. 10).

and concentration more than a quarter of the workday. (R. at 539). The form also included the diagnostic criteria for listing 14.06 related to undifferentiated and mixed CTD. (R. at 542). Dr. Lee checked these boxes as well, purporting to be his opinion that Melanson had at least two of the constitutional symptoms or signs required by the listing and a marked impairment in all three functional areas – including activities of daily living, maintaining social functioning, and concentration, persistence, or pace. (R. at 542-43).

In addition to Dr. Lee's medical records, the ALJ also reviewed opinions from two agency physicians, Dr. Eugene Godwin and Dr. Tony Constant, who reviewed Melanson's records in September and December 2015, respectively. Both state agency physicians opined that Melanson's diagnoses included systemic sclerosis, mixed CTD, thyroid disorder and fibromyalgia, all of which were severe. (R. at 75, 86). Neither doctor believed Melanson's impairments met the requirements for listings under 14.04 (systemic sclerosis) or 14.06 (mixed CTD). Both believed Melanson could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, stand or walk a total of four hours and sit a total of six hours in each eight-hour workday, and occasionally climb, stoop, kneel, crouch, or crawl. (R. at 75-78, 86-88).

The ALJ also received testimony from a Vocational Expert ("VE"). The VE first testified in response to a hypothetical framed by the ALJ that an individual of Melanson's age, education, and work experience who is limited to light work involving no more than four hours of standing or walking in an eight-hour day, only occasional postural activity, and no exposure to environmental extremes could perform any of Melanson's past work – either as normally performed or as he had performed it. (R. at 64). The VE opined that certain of Melanson's past positions were ordinarily performed at the sedentary level. These included skilled positions as an operations manager and call-center supervisor, which fit the hypothetical. The VE noted, however,

that Melanson's descriptions of those positions suggested he performed them at the medium exertional level. (R. at 62-64). The ALJ then asked the VE about other positions in the national economy consistent with the hypothetical at the light or sedentary level. He identified garment sorter (DOT #222.687-014) and paper-pattern folder (DOT #794.687-034) at the light level, and addresser (DOT #209.587-010) and nut sorter (DOT #521.687-086) at the sedentary level. (R. at 65-66).

On cross-examination by Melanson's counsel, the VE stated that these jobs did require frequent reaching, handling, and fingering, and if Melanson were unable to grasp and hold objects more than 10 days per month he could not perform them. (R. at 69). In addition, the VE stated that competitive work would ordinarily permit no more than one or two unexcused absences per month and that if Melanson were off task more than 25% of the workday, he would be eliminated from competitive employment. (R. at 66). He also stated that his testimony was consistent with the Dictionary of Occupational Titles. (R. at 67).

In his motion for summary judgment, Melanson argues that the ALJ improperly weighed the medical opinion evidence. Specifically, he claims the ALJ should have assigned more weight to the disability report completed by one of his treating physicians, Dr. Lee. He also claims the ALJ relied too heavily on the opinions of non-examining agency consultants Dr. Godwin and Dr. Constant and failed to properly assess his credibility. The Commissioner's motion argues that all of the ALJ's findings are supported by substantial evidence in the record.

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence in the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v.

7

Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

To qualify for DIB under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act. See 42 U.S.C. §§ 416(i), 423.

8

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§423(d)(1)(A) and 416(i)(1)(A).   To meet this

definition, a claimant must have a "severe impairment" which makes it impossible to do previous

work or any other substantial gainful activity that exists in the national economy.   20 C.F.R.

§ 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all

material facts will be considered in determining whether a claimant has a disability. The

Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.

The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of
   impairments which significantly limit his or her physical or mental ability to do
   the work activities?

3. Does the individual suffer from an impairment or impairments which meet or
   equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment"
   or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from
   performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing
   any other work?

An affirmative answer to question one, or a negative answer to question two or four, results

in a determination of no disability.   An affirmative answer to question three or five establishes

disability.   This analysis is set forth in 20 C.F.R. sections 404.1520 and 416.920.   The burden of

proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps, the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d 1456.

## A.    The ALJ's Decision

In this case, after conducting the foregoing analysis, the ALJ concluded that Melanson met the insured status requirements from his amended disability onset date of November 11, 2014,[2] through his date last insured, December 31, 2018, but had not been under a disability within the meaning of the Social Security Act between the alleged disability onset date and the date of the hearing. (See R. at 21).

At step one, the ALJ found Melanson had not engaged in substantial gainful activity after his amended alleged onset date in November 2014 and through the date of the hearing. (R. at 14). At step two, the ALJ found that Melanson suffered from severe impairments of lupus, scleroderma, undifferentiated connective tissue disorder, Raynaud's Syndrome, thyroid disorder, and fibromyalgia. (R. at 14-15 (citing 20 C.F.R. § 404.1520(c)). At step three, after specifically analyzing three listings for immune system disorders, the ALJ found that Melanson did not suffer

---

[2] Melanson amended his alleged onset date at the hearing to coincide with the date he was last employed. (R. at 30-31).

from a listed impairment or combination of impairments that met the severity of any listed impairment. (R. at 18). At step four, the ALJ crafted an RFC designed to accommodate Melanson's several impairments as he had determined them. Specifically, he found Melanson had:

> the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except the claimant can only stand and/or walk for a total of four hours in an eight hour day, the claimant is limited to occasional postural activity, and the claimant cannot be exposed to environmental extremes, including extreme temperatures and humidity.

(R. at 16). At step four, relying on the testimony of the VE after presenting him with this RFC in hypothetical form, the ALJ concluded that Melanson could perform his past relevant work as that work was normally performed. (R. at 20). Consequently, the ALJ determined Melanson did not have a qualifying disability during the relevant period. (R. at 21).

Melanson now argues the ALJ erred by failing to properly weigh the medical opinion evidence regarding his condition – specifically, the opinion of his treating physician, Dr. Lee, who had treated Melanson's immune system disorders with medications and injections for more than 10 years. He also argues that the ALJ improperly weighed the opinion of two Agency consultants. As a result, he argues that the ALJ's opinion that he did not meet the elements of any listed impairment, or that he had the RFC to perform work on the national economy, were both unsupported by substantial evidence. He also argues the ALJ erred in evaluating his complaints of pain and his testimony regarding its disabling effects. As explained below, the ALJ did not err with respect to the issues Melanson asserts. Accordingly, this Report concludes there was no error requiring remand in the ALJ's RFC determination, or his conclusion that Melanson was not disabled.

11

a.   The ALJ explained his reasons for finding Melanson's impairments did not meet or equal the relevant listings.

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). A claimant is entitled to this conclusive presumption of impairment "if he can show that his condition 'meets or equals the listed impairments.'" Id. (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)). To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). ALJs are obliged to explain their findings in sufficient detail to allow a court to determine if they were supported by substantial evidence. Radford, 734 F.3d at 291. A claimant for disability benefits under one of the listings must show she meets all criteria for that listing, and the burden is on her to demonstrate the same. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)[3]); Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

In total the ALJ examined all three listings related to immune system disorders of the type Melanson has. He concluded the medical record did not support any of them. In his Motion for Summary Judgment, Melanson challenges only one of those findings: the ALJ's conclusion on Listing 14.06 related to undifferentiated or mixed CTD. Mem. Supp. Mot. for Summ. J. 14-15 (ECF No. 10). This listing requires the claimant to demonstrate either:

---

[3] SSR 83-19 has been rescinded in part to the extent it addressed the procedures used to determine disability in children. It otherwise remains an accurate representation of the Social Security Administration's policies and regulations. See SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

    A.      Involvement of two or more organs/body systems, with:

          1.      One of the organs/body systems involved to at least a moderate level of severity; and

          2.      At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

Or

    B.      Repeated manifestations of undifferentiated or mixed connective disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

          1.      Limitation of activities of daily living.

          2.      Limitation in maintaining social functioning.

          3.      Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.06.

The ALJ concluded these requirements were not met, writing "Claimant's condition is stable, and without the required organ/body system involvement or required manifestations." (R. at 16). Melanson argues this summary dismissal is inadequate to provide a basis for judicial review. But where the ALJ analyzes the medical record in one part of the decision, he is not required to repeat that analysis in evaluating a listing. Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2000) (per curiam) (reading of ALJ opinion "as a whole" supports findings of no listed impairment as "analysis at subsequent steps of the evaluation are inconsistent with meeting" a listing). Reviewing the record as a whole, this Report concludes that the ALJ adequately analyzed the medical evidence and his conclusion that Melanson's impairments did not meet the requirements of Listing 14.06 is supported by substantial evidence.

The evidence Melanson primarily relies on to argue the ALJ erred is contained in an attorney-prepared medical summary completed by Dr. Lee. (R. at 529-43). The summary purports to opine in verbatim language that Melanson's impairments equaled those of the listing requirements. (R. at 542-43). As discussed in greater detail below, the ALJ justifiably gave this opinion evidence little weight. To the extent the opinion was offered on an issue reserved to the Commissioner, such as whether Melanson suffered from a listed impairment, it is not entitled to special deference. See 20 C.F.R. § 416.927(d)(1) and (2) (treating source opinion on issue reserved to Commissioner, such as whether impairments equal those of a listed impairment, is due no special deference). To the extent the opinion summarizes medical evidence elsewhere in the record, it represents only selected observations and does not preclude the ALJ reaching his conclusions based on the entire medical record.

Importantly, Melanson's brief does not contradict the ALJ's express observation that "at no point do his records indicate the Claimant was experiencing systemic involvement of any organs related to his CTD." (R. at 18). The ALJ also noted that despite Claimant's reports of "pain all over," there is no record of any emergent treatment and gaps of up to six months between Melanson's visits to Dr. Lee. (R. at 18). With respect to his CTD, the most recent visit before the ALJ hearing reflected essentially the same findings and treatment in the medical records for the preceding five years.

Melanson takes issue with the ALJ's reliance on this long course of treatment and his reference to the condition as "stable," noting correctly that a condition can be both stable and disabling at the same time. But that argument ignores many of the ALJ's other observations on the record which illuminate the relevance of his reference to Melanson's "stable" disease progression. It is not just that his condition was stable, but that it was stable and not disabling – at

14

least as recorded in Melanson's medical records.  The ALJ noted that Melanson's physical exams almost universally found him in no distress, with no acute synovitis[4] and good range of motion. (R. at 19).  He treated conservatively, relying exclusively on the medications and injections which appeared to maintain his relatively normal exam results and allowed him to function, including maintaining full time work until 2014.  As noted previously, Melanson's immune system diagnoses originated in 1998, and he has treated with Dr. Lee following essentially the same course of therapy through all of the time period covered by the available medical records.  Through most of this period Melanson was working full time.  And when he discontinued work, it was not the result of any particular symptom or limitation, as his last day of work coincides with a six-month gap in his treatment record with Dr. Lee.  (R. at 19) (observing that Melanson's treatment was largely consistent from at least 2006 to beyond his date last employed in November 2014).  As the ALJ also noted, Melanson's next appointment with his treating physician following his job loss was not until six months later in March 2015.  (R. at 17).   Based on this analysis of the medical record, and the deficiencies noted below in Dr. Lee's opinion evidence, the ALJ sufficiently explained his finding that the listing criteria were not met.  His explanation, though brief, is supported by substantial evidence in the record.

> b.    The ALJ relied on substantial evidence when assigning weight to conflicting medical opinion evidence.

Melanson next argues the ALJ failed to properly assess the medical evidence and improperly discounted the opinion of his treating physician, Dr. Lee, whose Medical Source

---

[4] Synovitis is joint pain caused by inflammation of the synovial membranes surrounding the joints.  Dorlands Illustrated Medical Dictionary 1879 (31st ed., 2007).

Statement purports to establish complete disability.   In addition to stating that Melanson's impairments met all the elements of Listing 14.06, the opinion purports to describe other limitations associated with his mixed CTD.   It states that he would be off task more than 25% of each workday, that he would be absent from work more than four days per month, and that he was "unable to work full time in competitive employment." (R. at 539).   The ALJ's substantially less limited RFC findings suggest he did not accept Dr. Lee's opinions on the severity of Melanson's limitations.

When the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered.   20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.   When the record contains a number of medical opinions from different sources that are consistent with each other, the ALJ is required to use that evidence to make a determination on disability.   20 C.F.R. §§ 404.1527(c), 416.927(c).   If, however, the medical opinions are inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them persuasive weight to properly analyze the evidence involved.   20 C.F.R. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Ordinarily, a treating source's opinion will be given controlling weight if it is well-supported by medically acceptable diagnostic methodology and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lewis v. Berryhill, 858 F. 3d 858, 867 (4th Cir. 2017).   But the ALJ need not accept opinions from a treating source in every situation.   For instance, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the

16

treating source's opinion is inconsistent with other evidence, or when it is not otherwise well-supported, it is due no special deference. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d); Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.[5] See Lewis, 858 F.3d at 868; Dunn, 607 F. App'x at 267. Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those

---

[5] Effective March 27, 2017, the SSA rescinded § 404.1527 and § 416.927 and implemented a new rule governing the consideration of medical opinions. See 20 C.F.R. § 404.1520(c) (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Melanson filed his claim. Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D.W. Va. May 2, 2019).

same regulations specifically empower the ALJ – not the treating source – to determine whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Melanson argues that the ALJ erred by affording little weight to the opinion of his treating physician, Dr. Lee.  Pl.'s Mem. 15 (ECF No. 15); Pl.'s Reply 2-3 (ECF No. 18).  According to Melanson's brief, the ALJ's rationale for rejecting the opinion did not account for his lack of insurance in assessing his course of treatment and drew impermissible inferences from Dr. Lee's repeated references to his condition as "stable."   The Commissioner argues that the weight assigned to Dr. Lee's opinion testimony was supported by substantial evidence, and that certain opinions Melanson relies upon were due no special deference in any event.  Def.'s Mem. Supp. Mot. for Summ. J. 16-22 (ECF No. 12).  The Commissioner is correct.

Before analyzing Dr. Lee's opinion testimony, the ALJ conducted an extensive review of the medical evidence, including Melanson's long treatment history with Dr. Lee.  He noted that during much of this time, more than fifteen years, Melanson remained employed full time, and was treated consistently with prescription pain relief and occasional steroid injections.  (R. at 19).  The ALJ observed that his physical exams were generally within normal limits and his CTD symptoms appeared to be managed with his medication regimen.  While he did have fibromyalgia flares, the ALJ noted they were only occasional.  He observed that if Melanson's pain were as severe as described, one would expect to see more treatment records even if they are only for an emergency room visit.  (R. at 18).  cf. Lewis, 858 F.3d at 867 (rejecting ALJ's assessment of opinion by a treating physician who saw claimant "for four years essentially on a bi-weekly basis").

In assessing the opinion testimony in Dr. Lee's disability evaluation, the ALJ explicitly gave the opinions "little weight," noting that they were inconsistent with Dr. Lee's own treatment record, which indicated "generally normal exam findings with the exception of positive tender

18

points consistent with fibromyalgia." (R. at 19).  He noted the record did not reflect a worsening of symptoms, and critically wrote that the form of the opinion was a "mere check the box form full of leading questions prepared by the claimant's representative designed to elicit positive responses." (R. at 19).  While Melanson complains this critique elevates form over substance, the ALJ's criticism went to the heart of the opinion's persuasive force.  He noted that much of the information on the opinion form was not even in Melanson's medical records but consisted of excerpts from websites and drug company literature describing symptoms of CTD sufferers generally.  (R. at 19, 530) (citing Mayo Clinic website summary of CTD symptoms).  The actual records referenced in the opinion were "cherry picked" according to the ALJ, to exclude references to Melanson's progress on medication and his stable course of treatment. (R. at 19).  A particularly egregious example highlighted in the briefing is Dr. Lee's opinion that sufferers of connective tissue disease can experience swelling in their fingers to the point they "resemble sausages." (R. at 530).  This opinion does not even relate to Melanson's symptoms as recorded in the treatment history.  But Melanson testified to his own swollen fingers in response to his representative's leading question.[6]  Counsel then attempted to use this limitation in his cross-examination of the VE, eliciting testimony that a person unable to manipulate their fingers for 10 days per month would not be able to do the work identified in response to the ALJ's hypothetical. (R. at 69).  But there is no mention of finger swelling – much less to the point of "resembling sausages" in the medical records cited to the court.  Nor is there mention of Melanson ever complaining that his fingers swelled to look like sausages.  Moreover, many of the records Dr. Lee's opinion did rely

---

[6] "Counsel: You had indicated that swelling and pain in the hands about 10 days out of the month.  Fingers swell to the point that they look like sausages . . . Is that the description you gave me, that I gave Dr. Lee.  Does that sound accurate?  Melanson: Yes." (R. at 60).

Case 2:18-cv-00488-RAJ-DEM   Document 14   Filed 06/14/19   Page 20 of 25 PageID# 139

on as the basis for his conclusion that Melanson would be severely limited are from treatment notes while he was still employed full time – a fact the ALJ also relied upon in according the opinion little weight. (R. at 19).

In this case, the ALJ gave sound reasons for the limited weight assigned to Dr. Lee's opinion. His long treatment history consists mostly of adjustments to his medication and steroid injections which appeared to control his symptoms. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). His form opinion appears to have omitted references to his largely normal objective findings and amplified symptoms which may exist in the general population of sufferers but which have never been mentioned in Dr. Lee's long history of Melanson's treatment. The ALJ's observations that Melanson's condition and treatment history did not reflect significant worsening to account for his inability to work after November 2014 are supported by substantial evidence. In short, the opinion admittedly prepared by Melanson's counsel appears to be as much argument as evidence. The ALJ – as factfinder – was permitted to assign it limited weight. The reasons he assigned for doing so provide no basis for the court to reject his assessment.

The state agency consultants who reviewed Melanson's records also concluded he was capable of light work. Both found that he was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing or walking up to four hours per day; and sitting up to six hours per day with normal breaks. (R. at 77, 87). Melanson argues the ALJ improperly relied on these State Agency physicians' opinions as substantial evidence for his conditions. Pl.'s Mem. Supp. Mot. for Summ. J. 23-24 (ECF No. 10). The ALJ gave significant weight to both opinions that Melanson had the ability to perform a reduced range of light work because these opinions were "supported

by the objective findings of record including the physical exams ..." and Melanson's generally normal findings except for occasional tender points consistent with fibromyalgia. (R. at 19).

State Agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a State Agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to State Agency opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e); see 20 C.F.R. §§ 404.1513a, 416.913a. Although consulting physicians' opinions cannot serve as a basis for denying benefits when contradicted by all of the other evidence in the record, they can be used as a basis for a determination of no disability if supported by other evidence before the ALJ. See Smith, 795 F.2d at 348.

Melanson argues the ALJ's assessment of the consulting opinions is flawed because it failed to account for the diagnostic criteria and symptoms of his impairments and because neither consultant had the benefit of Dr. Lee's 2017 opinion evidence or the treatment records which followed their review. But the ALJ considered all of this evidence and, as set forth above, found any deterioration in Melanson's condition insufficient to render him incapable of work. And both reviewers had access to the entire record of his treatment with Dr. Lee and relied on that record in reaching their own conclusions. (R. at 74-75; 85). The fact that they did not also assess Dr. Lee's attorney-prepared opinion testimony would not diminish their reports as substantial evidence to support the ALJ's conclusions.

The ALJ's opinion carefully considered the entire range of medical evidence.  Craig, 76 F.3d at 594-95; SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016); see also SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) ("The RFC assessment must be based on all of the relevant evidence in the case record.").    It is not this court's function to conduct a blank slate review of the evidence, Smith, 795 F.2d at 345, or undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012).  Rather, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.  Johnson, 434 F.3d at 653.

      c.     The ALJ did not err in assessing Claimant's credibility.

Finally, Melanson argues the ALJ erred in only partially crediting his subjective statements regarding his pain and the limitations imposed by his impairments.  He objects to the ALJ's reliance on his relatively stable long-term treatment regimen, and gaps in his treatment with Dr. Lee, as not pertinent given his limited financial means and uninsured status.  He also argues the ALJ selectively relied on his daily activities while ignoring evidence that he frequently required naps and had limited ability to perform household chores. Mem. Supp. Summ. J. 27-29 (ECF No. 10).

The ALJ's RFC assessment must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  The ALJ is required to consider all relevant non-medical evidence in making a credibility determination, but only to the extent such evidence "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(3);

Lewis, 858 F.3d at 867 (ALJ must credit claimant's testimony when such testimony is not contradicted by other evidence in the record).

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. Craig, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p. The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. Craig, 76 F.3d at 594; SSR 16-3p, at *2. The ALJ must consider all the medical evidence in the record. Craig, 76 F.3d at 594-95; SSR 16-3p, at *8; see also SSR 96-8p, at *5. If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. Craig, 76 F.3d at 595. The ALJ's evaluation must take into account all the available evidence, including statements by the claimant regarding the extent of his symptoms. The ALJ must consider the statements, and the degree to which "they are consistent with objective medical evidence and the other evidence." SSR 16-3p, at *5-6; Craig, 76 F.3d 595-96.

Here, the ALJ determined Melanson's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his statements regarding the intensity, persistence, and limiting effects were "not entirely consistent with the medical evidence and other evidence." (R. at 17). Specifically, the ALJ found that both the subjective and objective statements in the medical record were inconsistent with the Claimant's reports of disabling pain. He noted again that Melanson had a long-term, stable course of therapy which appeared to relieve his symptoms sufficient to permit work. The recorded physical observations show no limits in range of motion, no synovitis, and his regular attendance as well-appearing and in no distress.

23

As discussed above, so long as the ALJ's decision in assessing a claimant's statements is supported by substantial evidence, this court does not undertake to re-weigh the evidence.  Because the ALJ's decision to discount Melanson's testimony regarding the impact of his conditions on his ability to work was supported by substantial evidence, that assessment does not warrant remand.

## V.    RECOMMENDATIONS

For the foregoing reasons, the undersigned recommends that the court DENY Melanson's Motion for Summary Judgment (ECF No. 10), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 11) and AFFIRM the final decision of the Commissioner.

## VI.    REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is DIRECTED to provide a copy of this Report and Recommendation to all counsel of record.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 14, 2019